UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
KISSAIRIS VALERIO,                     :
                         Plaintiff,    :
                                       :    23cv1938 (DLC)
            -v-                        :
                                       :    OPINION AND
METROPOLITAN TRANSPORTATION AUTHORITY, :    ORDER
                                       :
                         Defendant.    :
                                       :
-------------------------------------- X

APPEARANCES:

For plaintiff:
Alan Wolin
Wolin & Wolin
33 South Service Road, #189
Jericho, NY 11753

For defendants:
Brian Isaac Confino
2 Broadway
Ste 4th Floor
New York, NY 10004

DENISE COTE, District Judge:

    Kissairis Valerio, a former Police Officer with the

Metropolitan Transportation Authority ("MTA") Police Department,

asserts that the MTA discriminated against her when it

terminated her employment.  The MTA has moved for summary

judgment on all of the plaintiff's claims.  For the following

reasons, the MTA's motion for summary judgment is granted.

**Background**

The following facts are taken from the evidence submitted in connection with the summary judgment motion.  The facts are undisputed or taken in the light most favorable to the plaintiff, unless otherwise noted.

The MTA maintains a police department, the MTAPD.  On April 14, 2021, Valerio received an offer of employment as a Police Officer with the MTAPD, effective April 21.  The letter informed Valerio that her employment was conditioned on her successful completion of the NYPD Academy curriculum and a probationary period of one year of service following graduation from the Academy.

The MTAPD uses the NYPD Academy to train its recruits. Valerio began training at the Academy with the April 2021 recruit class.  The training period at the Academy lasts six months and Valerio completed that training on time, on October 22, 2021.  Valerio then completed field training on December 21. The MTAPD terminated Valerio's employment in February of 2022, citing misconduct during her training at the Academy.

During Valerio's training at the NYPD Academy, MTAPD Police Officer Julie Cutrone acted as the liaison with the NYPD at the Police Academy.  As the liaison, Cutrone was responsible for supervising the attendance and training of MTAPD recruits and

making sure that they followed NYPD rules.  Cutrone is an Hispanic woman.

Two incidents occurred at the Academy that were discussed at the time Valerio's employment was terminated.  They are the issuance of a Letter of Instruction and a Notice of Intent to Discipline.  Each is described below.

1. Letter of Instruction

On August 2, 2021, Valerio received a Letter of Instruction ("Letter") for improperly addressing a Police Academy staff member on July 23.  That staff member was MTAPD Detective Sergeant Echavarria.

On July 23, 2021, Valerio had been taken out of training for Detective Sergeant Echavarria to instruct Valerio, in Officer Cutrone's presence, on the importance of following the chain of command.[1]  According to the Letter, when Echavarria was finished giving the instruction, Valerio replied "is that it?" and walked away without being properly dismissed.  The Letter

---

[1] Valerio had not followed the chain of command in complaining about her return to the Academy following surgery. Valerio had undergone a surgical procedure during her time at the Academy.  After the Office of Health Services cleared Valerio to return to full duty, Officer Cutrone did not immediately return Valerio to full duty.  Valerio called Lieutenant Grigsby to ask whether Cutrone could delay her return to full duty.  Lieutenant Grigsby had been Cutrone's supervisor but had been promoted; at the time of Valerio's call, Detective Sergeant Echavarria was Cutrone's supervisor.

identifies this as a violation of NYPD Recruit Handbook § 3.4,

"Addressing a Police Academy Staff Member."

Section 3.4 states that

> The recruit officer will stand and remain at
> attention until instructed to do otherwise.  The
> recruit officer shall use the terms "sir" or "ma'am,"
> as appropriate, in any conversation with instructors
> or other staff members regardless of rank, title, or
> designation.  At no time will an instructor or staff
> member be addressed by their first name, regardless of
> any prior relationship the recruit may have with that
> individual.  The recruit officer will not depart until
> dismissed by the ranking officer.  The recruit officer
> shall courteously and clearly state their rank, name,
> shield number, and command, or otherwise provide them,
> to anyone who requests such information.

Valerio signed the Letter, as did Detective Sergeant

Echavarria and MTAPD Captain Matt Taffner.  A Letter of

Instruction is not considered a disciplinary action.  Echavarria

also provided a memorandum to Taffner explaining why he had

issued the Letter to Valerio.

Valerio disputes the events described in the Letter.  She

testified at her deposition that after Detective Sergeant

Echavarria spoke to her on July 23, he walked away without

dismissing her.  Valerio testified that she then saluted, said,

"have a great day," and began to walk away.  After she began to

leave, Officer Cutrone yelled out, "you are dismissed."  Valerio

testified that, when she was presented with the Letter, she

disagreed with the description of events, but that Echavarria

told her that she had to sign the Letter and that the union could not assist her because she was a probationary employee.

    2. Gun and Shield Day

The principal event that led to the termination of Valerio's employment occurred on October 22, 2021.  That day was Gun and Shield Day at the NYPD Academy, which is the day on which each recruit is presented with their MTAPD badge and their firearm, along with a gun box, several types of ammunition, and other firearm equipment.  It is undisputed that Valerio left the NYPD Academy early, left her gun box behind without securing it, and did not report that to her supervisor either on October 22, which was a Friday, or over the weekend.

On Monday, October 25, Officer Cutrone contacted Valerio and informed her that she had Valerio's gun box.  Cutrone instructed Valerio to write a memorandum regarding the incident.  Valerio did so and submitted it to Detective Sergeant Echavarria.

Valerio's October 25 memorandum describes the event as follows.  On October 22, Valerio and the other recruits received their firearms and ammunition.  They had been instructed to "put our boxes away" where they wouldn't be seen during the ceremony.  Valerio put her box, which contained 34 rounds of ammunition and two empty high-capacity magazines, on top of her recruit bag.

Officer Cutrone instructed everyone to stack the boxes on the side of the room and Valerio's gun box was moved there along with everyone else's.  At 12:05 Valerio asked Cutrone to leave early due to a dental emergency.  Valerio signed out, rushed to her car, made telephone calls to dentists, and when she arrived at her vehicle, "realized that my gun box was not in my recruit bag."  Valerio's memorandum explains that she sent "an immediate notification" to a group chat with other recruit officers asking someone to secure her gun box for her.  The memorandum concludes: "I was then told that PO Cutrone requested the box from my coworkers so she could safeguard it.  At that point I assumed that my gun box was secured and safeguarded and that the notification was no longer needed."

Officer Cutrone also prepared a memorandum on October 25 and sent it to Detective Sergeant Echavarria.  Cutrone's memorandum explains that Valerio had been given permission to leave the Academy early, at 12:05 p.m., to go to the dentist. At 2:00 p.m., Company Sergeant Scott brought an "unattended Glock 19 box" to Valerio's attention.  It was the gun box with ammunition that had been issued to Valerio.  Cutrone took possession of the box for safekeeping.

At her deposition, Valerio testified that she did not think that leaving the gun box behind had been a "big deal."  Valerio

also offered a different version of events from that contained
in her October 25 memorandum.  She stated that she had placed
the gun box in her recruit bag while at the NYPD Academy, but
that she realized it was missing as she walked to her car.  She
thought someone must have removed the box from her bag without
her knowledge.  She further testified that she then contacted
another officer, who called Valerio back and stated that the box
had been found and that Officer Cutrone had asked for all boxes
to be placed on the side of the room.  Valerio asked the officer
to secure the box, and the officer put the box in his recruit
bag.  Later, the officer told Valerio that Cutrone had
confiscated Valerio's gun box.  Valerio testified that by the
time she left the dentist, she knew that Cutrone had taken
possession of the box and she intended to retrieve it on Monday.
Valerio could not identify or remember the name of the recruit
with whom she asserts she had spoken.

    3. Notice of Intent to Discipline

On December 16, MTAPD Acting Chief Joseph McGrann issued a
Notice of Intent to Discipline ("Notice") to Valerio.  Acting
Chief McGrann charged Valerio with three violations of
regulations arising out of the October 22 incident.  In doing
so, he largely relied upon Valerio's own description of the
events contained in her October 25 memorandum.

The Notice stated that Valerio was excused to leave the
Academy at 12:05 pm on October 22, following which:

> Upon exiting the Academy and while walking to
> your vehicle, you realized some of your Department
> issued equipment were missing.  The missing equipment
> consisted of two (2) high capacity magazines, thirty
> four (34) rounds of 9MM ammunition, a Glock 19
> carrying case, trigger safety lock and various
> additional accessories for your service weapon.
> Instead of immediately returning into the Academy to
> attempt to locate and secure your equipment, you sent
> a message to a group chat asking for someone to
> safeguard the items and you departed the location.
> You did not pursue the matter any further for a few
> days following the incident.  MTAPD Officer Cutrone
> had to contact with you on Monday, October 25, 2021,
> regarding your missing equipment.

The Notice concluded that Valerio's actions were in
violation of both the MTAPD Manual and the NYPD Recruit Officer
Handbook.  In particular, it stated that Valerio had violated
§ 2-01 of the Rules of Conduct, § 7-03 of the Uniform and
Equipment Regulations, and § 7-05 of the Firearm regulations of
the MTAPD Manual.

Section 2-01 of the Rules of Conduct states in relevant
part that a member of the MTAPD "shall not engage in conduct
prejudicial to good order, efficiency, or discipline, whether or
not specifically mentioned in this Manual."  Section 7-03 states
in relevant part that members of the MTAPD "are accountable for
all uniform clothing and equipment, Department issued or
otherwise."  Section 7-05 states in relevant part that members

of the MTAPD "shall exercise the utmost care in the safe handling and securing of all firearms and ammunition."

    4. Valerio's Employment is Terminated.

    Valerio's employment was terminated on February 23, 2022. Shortly after Gary Beahan became the MTAPD Acting Chief of Police in January of 2023, the MTA Labor Relations department forwarded the Notice to him for a determination.  Chief Beahan explained in his deposition that he had heard Valerio's name when briefed on recruits' progress at the academy.  He knew that Valerio had been on light duty for medical reasons.  He testified, however, that he had not received any other information about Valerio and that he had not met Valerio.

    After receiving the Notice, Chief Beahan contacted Detective Sergeant Echavarria to ask about Valerio.  Echavarria informed Beahan of the Letter of Instruction he had issued in August of 2021 and provided him with the Letter.  They also discussed the October 22nd incident.  Beahan also contacted Labor Relations, which recommended that Valerio's employment be terminated.  Beahan was unaware of Valerio's race and national origin at the time he decided to terminate her employment. Beahan explains that he concluded that Valerio had lost MTA property while on probation and had a disregard for supervision and a dismissive attitude.  Beahan asserts that he was the sole

decision-maker regarding the termination decision and that no other MTA employee offered an opinion on whether Valerio should be fired.

On February 23, 2022, Valerio was fired.  The Letter of Termination was signed by Chief Beahan and stated that Valerio's employment was terminated due to "unsatisfactory probationary employment."

Valerio filed this action on March 7, 2023.  On January 26, 2024, following the close of discovery, the defendant filed this motion for summary judgment.  The motion was fully submitted on March 15.

## **Discussion**

A motion for summary judgment may be granted "only if there is no genuine issue of fact and the prevailing party [is] entitled to judgment as a matter of law."  <u>Indemn. Ins. Co. of N. Am. v. Unitrans Int'l Corp.</u>, 98 F.4th 73, 77 (2d Cir. 2024) (citation omitted).  "Summary judgment must be rejected if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Id.</u> (citation omitted).  The court's role is "not to resolve disputed questions of fact but solely to determine whether, as to any material fact, there is a genuine issue to be tried."  <u>Moll v. Telesector Res. Grp., Inc.</u>, 94 F.4th 218, 227 (2d Cir. 2024) (citation omitted).

In determining whether genuine issues of fact exist, the court must "review the record taken as a whole" and "must draw all reasonable inferences in favor of the nonmoving party." Id. Moreover, the court "may not make credibility determinations or weigh the evidence." Id. "Reliance upon conclusory statements or mere allegations," however, "will not suffice to defeat summary judgment." Id. (citation omitted). When the nonmoving party has "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," summary judgment is proper. Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). But if "the admissible materials in the record make it arguable that the claim has merit, then summary judgment dismissing a claim cannot be granted." Id. (citation omitted).

In a discrimination action, an "extra measure of caution is merited" before granting summary judgment because "direct evidence of discriminatory intent is rare." Id. (citation omitted). Thus, "the court must scrutinize affidavits and depositions carefully for circumstantial evidence that, if credited by the factfinder, could reasonably be interpreted as showing discrimination." Id. (citation omitted).

I.   Legal Standards

The plaintiff's federal claims, brought pursuant to Title VII of the Civil Rights Act of 1964, are for intentional race,

color, sex, and national origin discrimination.  Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Under Title VII, intentional discrimination is known as "disparate treatment" discrimination.  Bart v. Golub Corp., 96 F.4th 566, 569 (2d Cir. 2024).  To succeed on such a claim, a plaintiff must prove discrimination "either by direct evidence of intent to discriminate or, more commonly, by indirectly showing circumstances giving rise to an inference of discrimination."  Id. (citation omitted).  Because direct evidence of discriminatory intent is "rarely" available, "[c]ircumstantial evidence is often the sole avenue available to most plaintiffs to prove discrimination."  Id.

When only circumstantial evidence of discriminatory intent is available, disparate treatment claims are analyzed under the McDonnell Douglas burden-shifting framework to assess "whether the plaintiff has shown sufficient evidence of discrimination to survive summary judgment."  Id.  To establish a prima facie case of discrimination under this framework, a plaintiff must show that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse

employment action; and (4) the circumstances give rise to an inference of discrimination." <u>Id.</u> at 570 (citation omitted). The burden at this stage is "not onerous." <u>Id.</u> (citing <u>Tex. Dep't of Cmty. Affs. V. Burdine</u>, 450 U.S. 248, 253 (1981).

Once the plaintiff has established a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for its adverse action." <u>Id.</u> (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973)). If the employer makes such a showing, "the burden then shifts back to the plaintiff to prove that the employer's stated reason was pretext for discrimination." <u>Id.</u> The plaintiff is "not <u>required</u> to demonstrate the falsity of the employer's proffered reason," but can instead prove "that an impermissible factor was a <u>motivating factor</u>, without proving that the employer's proffered explanation was not some part of the employer's motivation." <u>Id.</u> (citation omitted) (emphasis in original).

Discrimination claims brought under the NYCHRL and NYSHRL are also analyzed using the same basic framework as Title VII claims. <u>Lenzi v. Systemax, Inc.</u>, 944 F.3d 97, 107 n.7 (2d Cir. 2019) (NYSHRL); <u>Leibowitz v. Cornell Univ.</u>, 584 F.3d 487, 498 n.1 (2d Cir. 2009) (NYCHRL). Claims brought under the NYCHRL, however, "must be reviewed independently from and more liberally than their federal" counterpart. <u>Loeffler v. Staten Island</u>

Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009) (citation
omitted).  The NYCHRL does not require that a plaintiff prove an
adverse employment action.  Mihalik v. Credit Agricole Cheuvreux
N. Am., Inc., 715 F.3d 102, 114 (2d Cir. 2013).  Rather, "the
plaintiff need only show differential treatment -- that she is
treated 'less well' -- because of a discriminatory intent."  Id.
at 110.  Nonetheless, "district courts must be mindful that the
NYCHRL is not a general civility code."  Id. (citation omitted).
Accordingly, the plaintiff "still bears the burden of showing
that the conduct is caused by a discriminatory motive."  Id.

     The NYSHRL was amended, effective August 12, 2019.  See
2019 N.Y. Sess. Laws ch. 160.  As amended, the NYSRL must be
"construed liberally for the accomplishment of the remedial
purposes thereof, regardless of whether federal civil rights
laws, including those laws with provisions worded comparably to
the provisions of this article, have been so construed."  N.Y.
Exec. Law. § 300 (2023).  The standard of liability under the
NYSHRL will thus be treated as akin to the standard under the
NYCHRL.

II.  Analysis

     A.   Initial Showing

     Valerio has brought claims for discrimination in the
termination of her employment with the MTAPD based on her sex,
race, national origin and ethnicity.  She identifies herself as

a Black Hispanic woman whose nation of origin is the Dominican Republic.  The parties agree for the purposes of this motion that three of the four elements of the plaintiff's prima facie case of discrimination are met -- the plaintiff belongs to a protected class, the plaintiff was qualified for her position, and her termination as an MTAPD officer is an adverse employment event.  Nonetheless, the plaintiff cannot prevail on her claims of discrimination under Title VII because she has not identified admissible evidence that raises a question of fact as to whether the MTA acted with a discriminatory motive.

To support an inference of discrimination, a plaintiff may rely on "direct evidence of discriminatory animus," Radwan v. Manuel, 55 F.4th 101, 132 (2d Cir. 2022), or "circumstances giving rise to an inference" of discrimination.  King v. Aramark Servs. Inc., 96 F.4th 546, 563 (2d Cir. 2024) (citation omitted). Direct evidence is evidence that "the employer's motivation was discriminatory on its face," including "statements or actions by the employer's decisionmakers that may be viewed as directly reflecting the alleged discriminatory attitude."  Porter v. Dartmouth-Hitchcock Med. Ctr., 92 F.4th 129, 149 (2d Cir. 2024) (citing Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985)).  Circumstances giving rise to an inference of

discrimination may include "disparate treatment among similarly situated employees."  Radwan, 55 F.4th at 132.

Valerio has not presented any evidence, whether direct or circumstantial, that the termination of her employment was discriminatory.  She has offered no direct evidence of discrimination.  She has not identified, for example, any derogatory comments about her gender, race, skin color, or ethnicity.  Nor has she offered circumstantial evidence to support an inference of discriminatory intent.  She did not dispute in her October 25, 2021 memorandum that she left the Academy without securing her gun box and did not return to the Academy to do so as soon as she realized what she had done.[2]  She does not dispute that it was Officer Cutrone who contacted her the following Monday about her gun box.  She also does not dispute that the MTA had complete discretion to terminate her probationary employment for these violations so long as it did not act with discriminatory intent.

---

[2] Valerio attempts to create a question of fact regarding the events of October 22 by asserting in this litigation that she had secured the gun box by placing it in her recruit bag and that someone had removed it without her knowledge.  This assertion does not raise a question of fact regarding the MTA's intent in February of 2022 when it terminated her employment. It was entitled to rely on her description of events in her October 25 memorandum.  It could not foresee that she would alter that description.

Moreover, it is undisputed that it was Chief Beahan who made the decision to fire Valerio.  Valerio admitted in her deposition that she has no evidence that Beahan acted in a discriminatory manner.  He never met Valerio and testified that he was unaware of her race or national origin.  While Valerio argues that Beahan had access to her personnel file and thus could have been aware of her race and national origin when he decided to terminate her employment, she has not presented any evidence to justify speculation that he acted based on any protected characteristic.  Relying on Valerio's own written description of her actions on October 22, and his consultation with the Labor Relations department, he concluded that she had violated the MTAPD's rules of conduct and that termination of her employment was appropriate.  Whether job performance is satisfactory "depends on the employer's criteria for the performance of the job -- not the standards that may seem reasonable to the jury or judge."  Thornley v. Penton Publ'g, Inc., 104 F.3d 26, 29 (2d Cir. 1997).

Valerio opposes this motion for summary judgment principally by making two arguments.  First, she argues that she was treated less well than six other probationary officers.

An inference of discrimination may be drawn from "a showing that an employer treated plaintiff less favorably than a

similarly situated employee outside the plaintiff's protected
group."  Aramark, 96 F.4th at 563 (citation omitted).  There must
be "a reasonably close resemblance of the facts and
circumstances of plaintiff's and comparator's cases."  Id.
(citation omitted).  This rule does not require, however,
"precise identicality" between comparators and the plaintiff.
Id. (citation omitted).  For such evidence to be able to support
a jury verdict and thus survive summary judgment, "there must
only be an objectively identifiable basis for comparability."
Id. (citation omitted).

     Valerio has not offered any admissible evidence regarding
five of the comparators.  Relying on a conversation with someone
from the Guardians' Association, she presents a list of five
names.  The plaintiff admitted in her deposition that she has no
personal knowledge of these comparators.  Nor has she offered
affidavits from the comparators or records concerning their
employment by the MTA.  In sum, she has offered no admissible
evidence to support her assertion that any of these individuals
is a reasonable comparator or that they were treated less well
than she was.

     The plaintiff identifies one other comparator, a white,
non-Hispanic male.  He was in her recruit class at the NYPD
Academy.  She testified that she learned through a group chat

that he lost pay because he had lost his shield and
identification on Gun and Shield Day.  This is pure hearsay and
not admissible evidence of the truth of these assertions.  Fed.
R. Evid. 801.  In any event, the plaintiff does not explain
whether the comparator promptly reported the loss to his
supervisor or not.  Without knowing that critical element, it is
impossible to assess whether his experience supports an
inference of discrimination.

Second, Valerio resists this motion for summary judgment by
arguing that Chief Behan's decision to terminate her employment
was influenced by Officer Cutrone, who was biased against her.
Indeed, the only person that Valerio alleges acted with
discriminatory intent was Cutrone.  Valerio stresses that
Cutrone is not Black even if she is an Hispanic woman whose
nation of origin is also the Dominican Republic.  Valerio argues
that the MTA is liable for Cutrone's discriminatory conduct
under the "cat's paw" theory of liability.

The "cat's paw" theory allows for employer liability in a
situation where an agent of the employer "manipulates an
employer into acting as a mere conduit for his discriminatory
intent."  Menaker v. Hofstra Univ., 935 F.3d 20, 38 (2d Cir
2019) (citation omitted).  In such a case, "so long as the agent
intended and was the proximate cause of the adverse result, the

agent's discriminatory intent may be imputed to the employer under traditional agency principles," which provide for liability where the employer was negligent by acting at the agent's behest "when it knew or should have known of the agent's discriminatory motivation."  Id. (citation omitted).

The plaintiff has failed to offer admissible evidence to support her cat's paw theory.  Valerio has failed to offer evidence that Officer Cutrone was the proximate cause of the termination of her employment, that the MTA should have known that Officer Cutrone harbored discriminatory animus against her, or that Officer Cutrone actually harbored any discriminatory animus against her.

To begin with, the proximate cause of Valerio's termination of employment was her mishandling of her gun box.  Valerio admitted in her October 25 memorandum that she did not secure her gun box before leaving the Academy and did not return to secure it when she realized her error.  While Valerio points to the fact that she never admitted that her conduct violated each of the three cited regulations, she has offered no evidence to suggest that this occurrence during the training period at the Academy did not have to be formally reported and addressed.  Moreover, the Notice largely relied on Valerio's own written description of the events of October 22.  There is, in short, no

allegation that Officer Cutrone made a false report or acted in a way that was inconsistent with her responsibilities as a supervisor of a class of recruits.

Valerio instead speculates that Chief Beahan's decision to terminate her employment may have been influenced by some conversation between Officer Cutrone and Beahan.  She also relies on other interactions that she had with Cutrone at the Academy to suggest Cutrone had acted with discriminatory intent against her on other occasions.

Chief Beahan has explained in his affidavit and in his deposition that he did not consult with anyone other than Labor Relations regarding the decision to terminate Valerio's employment.  Beahan asserts that he never spoke to Officer Cutrone about the decision to terminate Valerio's employment and that she had no input into it.  Indeed, no MTA employee outside of Labor Relations offered any opinion to him about the termination.  He did not review any documents prepared by Cutrone regarding Valerio and was unaware of any issues Valerio may have had with Cutrone.  He represents that he never spoke with Cutrone about Valerio's performance at the Academy.

To raise a question of fact about Officer Cutrone's involvement in Chief Beahan's decision, Valerio relies on a passage in Beahan's deposition in which he responded to the

question, "did you ever speak to [Cutrone] about Valerio?" by saying,

> Yes.  I don't know if it was after all this started.  Specifically there would be no real reason to -- to mention an individual officer, as far as that goes.  I do remember Julie [Cutrone] and John [Echavarria] in my office discussing this situation.

The questioning does not clarify when this conversation occurred or what "situation" was discussed.  During his deposition, Chief Beahan also recalled that Officer Cutrone was present when Detective Sergeant Echavarria presented him with the Letter of Instruction.  He represents, however, that he spoke only with Echavarria regarding the Letter and that he did not recall Cutrone speaking at all during this discussion.  Nothing in the passages of Beahan's deposition in which he is specifically questioned about the termination decision suggests that Cutrone played any role whatsoever in that decision.

Moreover, there is insufficient evidence that Officer Cutrone harbored any discriminatory animus against Valerio.  Valerio has not offered evidence that Cutrone's treatment of her, even if stern, was motivated by Valerio's race, color, national origin, or gender.

Valerio explains that Officer Cutrone accused of her of taking drugs when she fainted; pointed at her and said, "you," to refer to her; pulled her out of class to discipline her; "took" deportment cards from her; and told her to "fix her

face."  These acts and statements, accepted as true for purposes
of this decision, do not give rise to an inference of
discrimination based on any protected characteristic.  After
all, "Title VII does not set forth a general civility code for
the American workplace."  Moll v. Telesector Res. Grp., Inc., 94
F.4th 218, 228 (2d Cir. 2024) (citing Burlington Northern & Santa
Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).

Valerio also points to the fact that she was removed as
assistant company Sergeant of her company following the issuance
of the Letter of Instruction and replaced by a white male
recruit.  But there is no evidence that Officer Cutrone was
responsible for either of those actions.  It was Detective
Sergeant Echavarria who ordered her removal from that office,
and Valerio was replaced by the only recruit who volunteered to
take on that position.

Next, Valerio asserts that Officer Cutrone imposed
additional restrictions on Valerio's training while Valerio was
under medical restrictions.  She also asserts that Cutrone
delayed in returning Valerio to full duty by a day or two after
the medical restrictions were lifted.  Valerio admits that she
was able to make up the training that she had missed despite
having been subject to additional medical restrictions and

despite that delay.  Again, this is not evidence that Cutrone harbored discriminatory animus against her.

Finally, Valerio argues that Officer Cutrone displayed discriminatory animus against two other recruits, both of whom were Hispanic women and one of whom was Black.  Valerio did not witness any of these interactions, however, and has offered no admissible evidence regarding the interactions between Cutrone and these two women.  While Valerio reports a conversation she had with one of the recruits, who cried and said that Cutrone had yelled at her and told her to "fix her face", that conversation constitutes hearsay to the extent it is offered to describe anything that Cutrone did or said.  Valerio has therefore failed to produce any admissible evidence that Cutrone displayed any discriminatory animus toward these recruits.

    B.  Pretext

Even if Valerio had met her prima facie burden, she has not shown that the stated reason for her firing was pretextual.  The MTA has offered evidence that Valerio was fired because she left her gun box unsecured and did not return to secure it, and because, in the opinion of Chief Beahan, Valerio had a disregard for supervision and a dismissive attitude.

Valerio argues that terminating her employment was excessive.  Valerio, however, did not present evidence that the termination decision was unusual, much less discriminatory.  As

discussed, she presented no admissible evidence of appropriate comparators, much less of comparators who were treated less harshly.  Therefore, Valerio's Title VII claims cannot survive summary judgment.

C.   NYCHRL and NYSHRL

Even under the more lenient standards of the NYCHRL and NYSHRL, the plaintiff must show that she was treated less well because of a discriminatory motive.  Because there is no evidence that the plaintiff was treated less well because of her race, color, gender, or national origin, the plaintiff's NYCHRL and NYSHRL discrimination claims must fail.

### Conclusion

The defendant's January 26, 2024 motion for summary judgment is granted.  The Clerk of Court is directed to enter judgment for the defendant and to close the case.

Dated:     New York, New York
           May 20, 2024

                                        DENISE COTE
                              United States District Judge